**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Applicant–Appellee,**

v.

**The CHEROKEE NATION, Respondent–Appellant.**

No. 88–2092.

United States Court of Appeals, Tenth Circuit.

March 28, 1989.

James G. Wilcoxen, Wilcoxen & Wilcoxen, Muskogee, Okl., for respondent-appellant.

John F. Suhre, Atty. (Charles A. Shanor, Gen. Counsel, Gwendolyn Young Reams, Associate Gen. Counsel, Vella M. Fink, Asst. Gen. Counsel, with him on the brief), E.E.O.C., Washington, D.C., for applicant-appellee.

Before McKAY, LOGAN, and TACHA, Circuit Judges.

McKAY, Circuit Judge.

I.

At issue in this case is the jurisdictional authority of the Equal Employment Opportunity Commission (EEOC) over the Cherokee Nation pursuant to the ADEA, *as amended*, 29 U.S.C. § 621–34 (1982). The dispute was precipitated by EEOC's attempt judicially to enforce an administrative subpoena duces tecum directing the Cherokee Nation to produce documents of several former tribal employees. The subpoena was issued as part of an EEOC

investigation of an age discrimination charge filed by complainant, Mrs. Louise Gossett, against the Cherokee Nation's Director of Health and Human Services.

The Cherokee Nation resisted the EEOC's assertion of authority, maintaining that tribal sovereign immunity precluded EEOC jurisdiction absent specific congressional intent to bring tribes under ADEA coverage. The district court examined the ADEA and its prototype—Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e(b) (1982)—and concluded that principles of statutory construction led to the conclusion that Congress intended the ADEA to apply to Indian tribes.[1] Therefore the EEOC was entitled to have its administrative subpoena enforced.

## II.

In *Donovan v. Navajo Forest Products Indus.*, 692 F.2d 709 (10th Cir.1982) we held that OSHA, a statute of general applicability, was nevertheless not applicable to a tribal business enterprise operating in the reservation for two reasons: First, because its enforcement would violate treaty provisions which recognized the tribe's right to exclude non-Indians from tribal lands. 692 F.2d at 712. Second, because enforcement "would dilute the principles of tribal sover-

eignty and self-government recognized in the treaty." *Id.*

This second basis for our holding in *Navajo Forest Products*—the treaty-protected right of self-government—is likewise at issue in the case before us.[2] The treaty's language clearly and unequivocally recognizes tribal self-government with only two express exceptions, neither of which is at issue in this case. We believe that the reasoning in *Navajo Forest Products* is equally applicable to the case at bar. Consequently, we hold that ADEA is not applicable because its enforcement would directly interfere with the Cherokee Nation's treaty-protected right of self-government.[3]

## III.

Like the Supreme Court, we have been "extremely reluctant to find congressional abrogation of treaty rights" absent explicit statutory language. *See United States v. Dion*, 476 U.S. 734, 739, 106 S.Ct. 2216, 2220, 90 L.Ed.2d 767 (1986). We are also mindful that we should not "construe statutes as abrogating treaty rights in a 'backhanded way'; in the absence of explicit statement, 'the intention to abrogate or modify a treaty is not to be lightly imputed to the Congress.' Indian treaty rights are too fundamental to be easily cast aside." *Id.* (citations omitted).

---

1. The district court's determination is a question of law, which we review *de novo*. *Matter of Tri–State Equip., Inc.*, 792 F.2d 967, 970 (10th Cir.1986).

2. Article V of the Treaty of New Echota, December 29, 1835, 7 Stat. 478, provides in pertinent part:

   The United States hereby covenant and agree ... [to] *secure to the Cherokee Nation the right by their national councils to make and carry into effect all such laws as they may deem necessary for the government and protection of the persons and property within their own country* belonging to their people or such persons as have connected themselves with them; provided always that they shall not be inconsistent with the constitution of the United States and such acts of Congress as have been or may be passed regulating trade intercourse with the Indians....
   (emphasis added).

3. The EEOC relies on the broad dictum in *Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 116, 80 S.Ct. 543, 553, 4 L.Ed.2d 584

(1960), to support its claim that the ADEA, as a statute of general applicability, applies to all persons including Indians. This argument is inapposite since it is well established that the so-called *Tuscarora* rule *is not applicable* to treaty cases such as this one. *See, e.g., Phillips Petroleum Co. v. United States Environmental Protection Agency*, 803 F.2d 545, 556 (10th Cir. 1986) (The *Tuscarora* "rule of construction can be rescinded where a tribe raises a specific right under a treaty ... which is in conflict with the general law to be applied...."); *Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113, 1116 (9th Cir.1985) (Although *Tuscarora* represents the general rule, there is an exception when "the application of the law to the tribe would 'abrogate rights guaranteed by Indian treaties.'"). In fact, in *Navajo Forest Products* we questioned the continuing vitality of the *Tuscarora* dictum in light of the Supreme Court's decision in *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982). 692 F.2d at 712–13.

In its carefully reasoned opinion, the district court attempted to determine congressional intent by comparing the statute on which ADEA was modeled, Title VII, which provides an express exclusion of tribes from the statute's coverage, with the ADEA, which is completely silent on the subject.[4] The court then applied normal rules of construction to reach its holding.

■ While normal rules of construction would suggest the outcome which the district court adopted, the court overlooked the fact that normal rules of construction do not apply when Indian treaty rights, or even nontreaty matters involving Indians, are at issue. *See, e.g., Montana v. Blackfeet Tribe*, 471 U.S. 759, 766, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985) ("[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."); *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 247, 105 S.Ct. 1245, 1258, 84 L.Ed.2d 169 (1985) ("[T]he canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians. Thus, it is well established that treaties should be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.... The Court has applied similar canons of construction in nontreaty matters."); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 152, 102 S.Ct. 894, 909, 71 L.Ed.2d 21 (1982) ("[I]f there [is] ambiguity ... the doubt would benefit the tribe, for 'ambiguities in federal law have been construed generously in order to comport with ... traditional notions of sovereignty and with the federal policy of encouraging tribal independence.' ") (quoting *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143–44, 100 S.Ct. 2578, 2583–84, 65 L.Ed.2d 665 (1980)).

We believe that unequivocal Supreme Court precedent dictates that in cases where ambiguity exists (such as that posed by the ADEA's silence with respect to Indians), and there is no *clear* indication of congressional intent to abrogate Indian sovereignty rights (as manifested, *e.g.*, by the legislative history, or the existence of a comprehensive statutory plan), the court is to apply the special canons of construction to the benefit of Indian interests. *Cf. Merrion*, 455 U.S. at 148–49 n. 11, 102 S.Ct. at 906–08 n. 11 ("Because the Tribe retains all inherent attributes of sovereignty that have not been divested by the Federal Government, the proper inference from silence [in the Tribe's Constitution] is that the sovereign power to tax remains intact."). We conclude that, in this case, the bases for inferring congressional intent were not so clear as to overcome the burden which the EEOC was required to carry.

REVERSED.

TACHA, Circuit Judge, dissenting.

Because I believe that there is clear indication of congressional intent to apply the Age Discrimination in Employment Act of 1967 (ADEA) to Indian tribes, I respectfully dissent.

Indian tribes possess inherent powers of sovereignty that predate the coming of the Europeans to this continent. *See United States v. Wheeler*, 435 U.S. 313, 322–23, 98 S.Ct. 1079, 1085–86, 55 L.Ed.2d 303 (1978). Their incorporation within the territory of the United States, and their acceptance of its protection, however, "necessarily divested them of some aspects of [that] sovereignty." *Id.* at 323, 98 S.Ct. at 1086. In addition to the implicit divestment of sovereign powers by virtue of tribal dependence upon the United States, other sovereign powers were explicitly yielded by treaties or removed by Congress. *Id.* at 322–23, 98 S.Ct. at 1085–86. "The Indian tribes [however] retain all aspects of tribal sovereignty not specifically withdrawn." *Donovan*

---

**4.** The language of the ADEA neither expressly includes nor excludes Indian tribes from coverage. In contrast, Congress has shown that it knows how to extend the ADEA's coverage when it chooses to do so. The original version of the ADEA expressly *excluded* states from the Act's definition of "employer". Age Discrimination in Employment Act of 1967, Pub.L. No. 90–202, § 11(b), 81 Stat. 602, 605. However, in 1974 Congress amended the Act, this time explicitly *including* states in the Act's coverage. *See* 29 U.S.C. § 630(b).

*v. Navajo Forest Prods. Indus.*, 692 F.2d 709, 712 (10th Cir.1982).

> The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status.

*Wheeler*, 435 U.S. at 323, 98 S.Ct. at 1086.

The laws of the United States recognize both sovereign immunity from suit and tribal self-government as aspects of the inherent sovereignty retained by Indian tribes. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58–60, 98 S.Ct. 1670, 1676–77, 56 L.Ed.2d 106 (1978); *see also White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142–43, 100 S.Ct. 2578, 2582–83, 65 L.Ed.2d 665 (1980). Both of these aspects of tribal sovereignty, however, whether or not established by treaty, are "subject to the superior and plenary control of Congress." *Martinez*, 436 U.S. at 58, 98 S.Ct. at 1676–77; *see also Bracker*, 448 U.S. at 143, 100 S.Ct. at 2583. "The United States retains legislative plenary power to divest Indian tribes of any attributes of sovereignty." *Navajo Forest Prods.*, 692 F.2d at 714. The issue in this case is whether, by enacting the ADEA, Congress has exercised its power to divest the Cherokee Nation of the aspects of tribal sovereignty here claimed.

In determining whether Congress has exercised such power, "a proper respect both for tribal sovereignty itself and for the plenary authority of Congress ... cautions that we tread lightly in the absence of clear indications of legislative intent." *Martinez*, 436 U.S. at 60, 98 S.Ct. at 1677–78. The majority notes that the courts have been " 'extremely reluctant to find congressional abrogation of treaty rights' absent

explicit statutory language." *Majority opinion* at 938 (quoting *United States v. Dion*, 476 U.S. 734, 739, 106 S.Ct. 2216, 2220, 90 L.Ed.2d 767 (1986)). The Supreme Court, moreover, has stated that "Congress' intention to abrogate Indian treaty rights [must] be clear and plain." *United States v. Dion*, 476 U.S. 734, 738, 106 S.Ct. 2216, 2220, 90 L.Ed.2d 767 (1986).

The majority apparently interprets the "clear intent" language of *Dion* to *require* explicit language applying the statute to Indian tribes either on the face of the statute or in its legislative history.[1] In my view *Dion* cannot be read as restrictively as the majority suggests.

In *Dion*, the Supreme Court stated that it has "enunciated ... different standards over the years for determining how such a clear and plain intent must be demonstrated." *Id.* at 739, 106 S.Ct. at 2220. Although an "[e]xplicit statement by Congress is *preferable* for the purpose of ensuring legislative accountability," the Court has not "rigidly interpreted that preference ... as a *per se* rule." *Id.* (emphasis added).

> [W]here the evidence of congressional intent to abrogate is sufficiently compelling, "the weight of authority indicates that such intent can also be found by a reviewing court from clear and reliable evidence in the legislative history of a statute." What is essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and the Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty.

*Id.* at 739–40, 106 S.Ct. at 2220 (citation omitted) (quoting F. Cohen, *Handbook of Federal Indian Law* 223 (1982)); *see Martinez*, 436 U.S. at 61, 98 S.Ct. at 1678 ("structure of statutory scheme" and "legislative history" did not support "intrusion into tribal sovereignty").

---

1. Although the majority parenthetically notes that congressional intent to abrogate Indian treaty rights could be manifested with the requisite clarity through the enactment of a "comprehensive statutory plan," *majority opinion* at 939, it fails to show why the ADEA, either alone or in conjunction with other civil rights legislation such as Title VII, is not such a comprehensive plan.

The majority finds that the ADEA provisions are ambiguous because they neither expressly include nor exclude Indian tribes from coverage. *Majority opinion* at 939 n. 4. The majority dismisses any analysis of Title VII in its review of the ADEA and therefore holds that the ambiguous provisions of the ADEA must be construed to the benefit of the Indians since there is no indication of contrary congressional intent. *Majority opinion* at 938–39. I am convinced, however, that discerning the legislative intent behind the relevant provisions of the ADEA here requires a comparison with the corresponding provisions of Title VII, in light of the fact that Congress was clearly aware of and relied upon Title VII's provisions when promulgating the ADEA.[2] In making such a comparison it becomes clear that any impingement upon tribal sovereignty by enforcement of the ADEA was intended by Congress.

I begin by examining the ADEA's definition of "employer" for purposes of the Act:

The term "employer" means a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year: *Provided,* That prior to June 30, 1968, employers having fewer than fifty employees shall not be considered employers. The term also means (1) any agent of such a person, and (2) a State or political subdivision of a State and any agency or instrumentality of a State or a political subdivision of a State, and any interstate agency, but such term does not include the United States, or a corporation wholly owned by the Government of the United States.

29 U.S.C. § 630(b). Congress utilized a similar definition in Title VII, which was enacted prior to the ADEA, except that definition expressly excludes "an Indian tribe" from qualifying as an employer for purposes of Title VII. *See* 42 U.S.C. § 2000e(b).

When interpreting a statute, Congress' intent as expressed in that statute is determinative. In discerning that intent, "we must presume that Congress acts with deliberation, rather than by inadvertence, when it drafts a statute." *United States v. Motamedi,* 767 F.2d 1403, 1406 (9th Cir. 1985). Because Title VII and the ADEA are devoted to the common purpose of proscribing employment discrimination, and the ADEA's definition of employer is patterned after the definition in Title VII, those definitional provisions should be construed *in pari materia. Cf. Kennedy v. Whitehurst,* 690 F.2d 951, 956–57 (D.C.Cir. 1982) (pointing to indications that the ADEA's enforcement provision for federal employment discrimination should be read *in pari materia* with Title VII). Further, when Congress explicitly enumerates certain exceptions to a statutory scheme, we may not imply additional exceptions without evidence of legislative intent to do so.

**2.** There is much evidence to indicate that Congress had an acute awareness of Title VII's provisions when promulgating the ADEA. During consideration of Title VII there were unsuccessful efforts to include age as one of the protected categories in that legislation. 110 Cong.Rec. 2596–99 (1964) (amendment to include age as protected category under Title VII offered by Rep. Dowdy; amendment rejected by vote of 94 to 123); 110 Cong.Rec. 9911–16, 13,490–92 (amendment to include age as protected category under Title VII offered by Sen. Smathers; amendment rejected by vote of 28 to 63); *see also EEOC v. Wyoming,* 460 U.S. 226, 229, 103 S.Ct. 1054, 1056, 75 L.Ed.2d 18 (1983) (noting that amendments to include age in Title VII were rejected). Title VII instead included a provision directing the Secretary of Labor to study potential age discrimination in the workplace and to make recommendations for com-

bating the problem if it existed. Civil Rights Act of 1964, Pub.L. No. 88–352, § 715, 78 Stat. 241, 265 (superseded by Equal Employment Opportunity Act of 1972, § 10, Pub.L. No. 92–261, 86 Stat. 103, 111). The Secretary's report led to the enactment of the ADEA. *See* J. Kalet, *Age Discrimination in Employment Law* 1–2 (1986). Commentators have noted that the ADEA is effectively a hybrid of Title VII's general scheme and the Fair Labor Standards Act's remedial devices. J. Kalet, *Age Discrimination in Employment Law* 1–3. *See generally* 2 H. Eglit, *Age Discrimination* § 16.01 (1988). "Because Title VII had already established a framework within which the ban on employment discrimination could be enforced, the Title VII enforcement scheme and proof considerations were followed extensively in the drafting of the ADEA." J. Kalet, *Age Discrimination in Employment Law* 2.

*See Andrus v. Glover Constr. Co.,* 446 U.S. 608, 616–17, 100 S.Ct. 1905, 1910, 64 L.Ed.2d 548 (1980). Finally, we must be mindful that the ADEA is a remedial statute and therefore should be liberally construed in favor of its beneficiaries. *See Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 765, 99 S.Ct. 2066, 2076, 60 L.Ed.2d 609 (1979) (Blackmun, J., concurring).

The definition of employer in the ADEA was patterned after the definition of employer in Title VII, with the important exception that Title VII explicitly excludes Indian tribes from the definition.[3] The omission of the Indian tribe exclusion in the ADEA, in light of the clear congressional reliance on Title VII's provisions, *see supra* note 2, evidences congressional intent on the face of the statute to include Indian tribes in the definition of employer for the purposes of the ADEA. Congress has carefully enumerated the exceptions to ADEA coverage, and I find no basis to imply a further exception for Indian tribes.

Furthermore, the Supreme Court has recognized that there is some purpose for the exclusion of Indian tribes from the definition of employer under Title VII—to enable Indian tribes to be free to give preference to Indians in tribal government employment. *Morton v. Mancari,* 417 U.S. 535, 548, 94 S.Ct. 2474, 2481, 41 L.Ed.2d 290 (1974); *see* 110 Cong.Rec. 13,701–03 (1964) (comments by Sen. Mundt regarding amendment to exclude Indian tribes from compliance with Title VII). I find no comparable reason for Congress to carve out an exception for Indian tribes under ADEA.

The majority bases its decision, in part, on *Navajo Forest Prods.,* 692 F.2d 709, in which we held that the Occupational Safety and Health Act (OSHA) did not apply to an Indian tribal business owned and operated by the Navajo tribe on the Navajo Reservation because its application would be in derogation of Navajo treaty rights. *Majority opinion* at 937–39. That case is not apposite. The definition of employer utilized in OSHA is not patterned after the Title VII definition, and in *Navajo Forest Products* we found nothing in OSHA's legislative history to conclude that Congress intended to abrogate tribal sovereignty. *Navajo Forest Prods.,* 692 F.2d at 712.

My review of the legislative history supports the conclusion that any limitations on the Cherokees' right to self-government here were intended by Congress when promulgating the ADEA. I would hold that the EEOC has jurisdiction over Indian tribes for purposes of enforcing the ADEA and that the subpoena issued in this case is enforceable. I, therefore, respectfully dissent.

---

3. The definition of employer in the ADEA as enacted is taken almost verbatim from the original definition in Title VII. The relevant language from § 701(b) of Title VII as originally enacted reads:

> The term "employer" means a person engaged in an industry affecting commerce who has twenty-five or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, *but such term does not include (1) the United States, a corporation wholly owned by the Government of the United States, an Indian tribe, or a State or political subdivision thereof....*

Civil Rights Act of 1964, Pub.L. No. 88–352, § 701(b), 78 Stat. 241, 253 (emphasis added).

The relevant language from § 11(b) of the ADEA as originally enacted reads:

> The term "employer" means a person engaged in an industry affecting commerce who has twenty-five or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year ... *but such term does not include the United States, a corporation wholly owned by the Government of the United States, or a State or political subdivision thereof.*

Age Discrimination in Employment Act of 1967, Pub.L. No. 90–202, § 11(b), 81 Stat. 602, 605 (emphasis added).