R.H. NERO; Carrie Brown; Mamie Ross Nivens; Caroline Green; William Nave; John Brown; Carolyn Vann Sams; Florence Ross; Edgar Curtis Vann; Roberta Drayton; Carl Ball; Audrey B. Gilliard; Susie Trent; Idella Ball; Arthell Edith Ball, an incompetent, by and through her legal guardian, Florence Ross; Lorraine Ball, an incompetent, by and through her legal guardian, Florence Ross; and other persons similarly situated, Plaintiffs–Appellants,

v.

The CHEROKEE NATION OF OKLAHOMA; Ross O. Swimmer; Dora Waite; Gary Chapman; Dorothy Worsham; Maude Davis; Elizabeth Sullivan; Marie Wadley; Ray McSpadden, individually and in their official capacity; United States of America; Office of the President; United States Department of the Interior; Office of the Secretary; the Bureau of Indian Affairs; Dennis Springwater; Frank Ferrell; Joe Parker, individually and in their official capacity, Defendants–Appellees.

No. 86–1271.

United States Court of Appeals,
Tenth Circuit.

Dec. 22, 1989.

James O. Goodwin of Goodwin & Goodwin, Tulsa, Oklahoma, for plaintiffs-appellants.

Myles E. Flint, Acting Asst. Atty. Gen., Washington, D.C., Layn R. Phillips, U.S. Atty., Peter Bernhardt, Asst. U.S. Atty., Tulsa, Okl., Robert L. Klarquist and William B. Lazarus, Dept. of Justice Land and Natural Resources Div., Washington, D.C., (Scott Keep and David Etherridge, U.S. Dept. of the Interior, Washington, D.C., of counsel) for defendants-appellees officers and employees of the U.S.

James G. Wilcoxen of Wilcoxen & Cate, Muskogee, Okl., for defendants-appellees, except officers and employees of the U.S. of America.

Before McKAY, SEYMOUR, and HIGGINBOTHAM *, Circuit Judges.

SEYMOUR, Circuit Judge.

Plaintiffs, who are descendants of slaves owned by Cherokees and freed by the Treaty of 1866 between the United States and the Cherokee Nation, brought suit against the Cherokee Nation, certain tribal officials, the United States, and various federal officials. According to the complaint, the 1866 Treaty and the Cherokee Constitution confer on plaintiffs the rights and privileges of Cherokee citizenship, although they are not of Cherokee blood. Defendants allegedly have violated a broad array of constitutional and statutory provisions by denying plaintiffs the right to vote in tribal elections and the right to participate in federal Indian benefits programs. Specifically, plaintiffs assert claims under the First, Fifth, Ninth, Thirteenth, and Fifteenth Amendments of the United States Constitution; the Indian Civil Rights Act; the Treaty of July 19, 1866; 42 U.S.C. §§ 1981, 1985(3), 1986, and 2000d; and the *Bivens* doctrine.

The district court dismissed plaintiffs' claims against the Tribe, its officials, and the United States on the basis of sovereign

* The Honorable Patrick E. Higginbotham, Circuit Judge, United States Court of Appeals for the Fifth Circuit, sitting by designation.

immunity. The court also granted summary judgment in favor of the federal officials, relying on the doctrine of qualified immunity. Plaintiffs appeal.[1] We affirm, although in some respects on grounds different from those relied on by the trial court.

## I.

### A. Suit Against the Tribe

■ The district court ruled that plaintiffs' suit against the Tribe is barred by sovereign immunity. This doctrine, "which recognizes the sovereignty of Indian tribes and seeks to preserve their autonomy, protects tribes from suits in federal and state courts." *Wichita & Affiliated Tribes of Oklahoma v. Hodel*, 788 F.2d 765, 771 (D.C.Cir.1986). The Supreme Court has stated unequivocally that Indian tribes possess "the common-law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978). This immunity can be waived both by tribal consent, *see Merrion v. Jicarilla Apache Tribe*, 617 F.2d 537 (10th Cir.1980) (en banc), *aff'd on other grounds*, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982), and by Congressional action, *see Santa Clara Pueblo*, 436 U.S. at 58, 98 S.Ct. at 1677. However, "[i]t is settled that a waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *Id.*

Plaintiffs make three arguments in an attempt to overcome the jurisdictional bar of sovereign immunity.[2] First, plaintiffs assert that their claims under Title I of the Indian Civil Rights Act (ICRA), 25 U.S.C. §§ 1301–1303 (1982 & Supp. IV 1986), should not have been dismissed because the ICRA, as interpreted by this court in *Dry Creek Lodge, Inc. v. Arapahoe & Sho-*

*shone Tribes*, 623 F.2d 682 (10th Cir.1980), cert. denied, 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847 (1981), deprives the Tribe of immunity from suit under its provisions. Plaintiffs alternatively urge that the Tribe waived its immunity to suit pursuant to the ICRA by virtue of a provision in the Cherokee Constitution. Finally, plaintiffs argue that the Tribe is amenable to suit under the various civil rights acts because the Treaty of 1866 limits the Tribe's sovereign power and, concomitantly, limits the scope of protection from suit afforded by sovereign immunity.

*Santa Clara Pueblo* and our decision in *Wheeler v. Swimmer*, 835 F.2d 259 (10th Cir.1987), make clear that plaintiffs' reliance on the ICRA is misplaced. In *Santa Clara Pueblo*, a female member of the tribe and her daughter challenged a tribal ordinance that denied tribal membership to the children of a female member who married outside the tribe. The plaintiffs relied on Title I of the ICRA which confers certain civil rights on members of the American Indian tribes, including the right to equal protection of the laws. *See* 25 U.S.C. § 1302(8). The Court acknowledged that the ICRA had modified the substantive law applicable to the exercise of sovereign tribal powers, but concluded that this modification by itself could not be interpreted as a waiver of the immunity from suit traditionally enjoyed by sovereign powers. *Santa Clara Pueblo*, 436 U.S. at 57–59, 98 S.Ct. at 1676–77. Noting that a waiver of sovereign immunity "cannot be implied but must be unequivocally expressed," the Court found nothing in Title I which "purports to subject tribes to the jurisdiction of the federal courts in civil actions for injunctive or declaratory relief." *Id.* at 58–59, 98 S.Ct. at 1677.

In *Swimmer*, 835 F.2d 259, a case arising from the same factual context as the

---

**1.** After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed.R. App.P. 34(a); 10th Cir.R. 34.1.8. The cause is therefore ordered submitted without oral argument.

**2.** *See Ramey Const. Co. v. Apache Tribe of Mescalero Reservation*, 673 F.2d 315, 318 (10th Cir. 1982) ("The issue of sovereign immunity is jurisdictional."); *see also White v. Pueblo of San Juan*, 728 F.2d 1307, 1309 (10th Cir.1984); *cf.* 14 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3654 at 186–90 (1985) (absence of consent of United States is jurisdictional defect).

present case, disappointed candidates for Cherokee Nation tribal offices sought federal court review of the tribal election process. They alleged, *inter alia*, that the tribe and various tribal officials had deprived plaintiff candidates of their civil rights in violation of the ICRA. We rejected plaintiffs' effort to secure federal relief for a violation of the ICRA, relying on *Santa Clara Pueblo*. "The only federal relief available under the [ICRA] against a tribe or its officials is a writ of habeas corpus. Actions for any other relief must be brought through tribal forums."[3] *Id.* at 261 (citation omitted).

Plaintiffs contend that their suit is not barred because it falls within an exception to tribal sovereign immunity outlined by this court in *Dry Creek Lodge*, 623 F.2d 682. A majority of the panel in *Dry Creek Lodge* concluded that such an exception exists under the ICRA where the dispute does not concern internal tribal issues, the plaintiff is non-Indian, and tribal remedies are unavailable.[4] The district court here held this exception inapplicable to plaintiffs' case because plaintiffs failed to pursue available tribal remedies and because the dispute concerns the internal tribal affairs of membership and government. We agree that plaintiffs do not fit within the exception outlined in *Dry Creek Lodge*, an exception this court has narrowly construed.[5]

Nor are we persuaded by plaintiffs' argument that the Cherokee Constitution waives the Tribe's immunity from suit under the ICRA. A waiver, as we noted at the outset, " 'cannot be implied but must be unequivocally expressed.' " *Santa Clara Pueblo*, 436 U.S. at 58, 98 S.Ct. at 1677. Plaintiffs urge us to construe language in the Cherokee Constitution providing that "the appropriate protection guaranteed by the ICRA shall apply to all members of the Cherokee Nation," Brief for Appellants at 27, as such an express waiver. The cited language no more constitutes an unequivocal expression of waiver than does the language of the ICRA, which itself creates the substantive rights supposedly guaranteed to all members of the Cherokee Nation, language which the Supreme Court refused to interpret as a waiver.

Plaintiffs primarily rely on two Ninth Circuit cases in arguing that the Treaty of 1866 limits the Cherokee Nation's sovereignty and, concomitantly, the Tribe's immunity from suit. *See Hardin v. White Mountain Apache Tribe*, 761 F.2d 1285 (9th Cir.1985), *superseded*, 779 F.2d 476

---

**3.** The ICRA provides that federal habeas corpus relief is "available to any person, in a court of the United States, to test the legality of his detention by order of an Indian Tribe." 25 U.S.C. § 1303 (1982).

**4.** *Dry Creek Lodge* involved non-Indian plaintiffs who owned land in fee simple within the boundaries of the Shoshone and Arapahoe Indians' Wind River Reservation. The superintendent of the Reservation promised the plaintiffs that access to a lodge they proposed to build would not be a problem, but after it was built the tribes blocked the sole road from the lodge to the highway. The tribes subsequently refused the plaintiffs access to the tribal court.

**5.** In *White v. Pueblo of San Juan,* 728 F.2d 1307 (10th Cir.1984), non-Indians who owned land within the Pueblo's boundaries invoked the ICRA and *Dry Creek Lodge* exception in their suit against the Pueblo for blocking the sale of their land to other non-Indians. This court rejected the plaintiffs' reliance on *Dry Creek Lodge,* noting that "[n]ecessarily the *Dry Creek* opinion must be regarded as requiring narrow interpretation in order not to come into conflict

with the decision of the Supreme Court in *Santa Clara." Id.* at 1312. Consistent with construing *Dry Creek* to "provide a narrow exception to the traditional sovereign immunity bar from suits," we held that an "aggrieved party must have actually sought a tribal remedy, not merely have alleged its futility." *Id. See also Ramey Const. Co. v. Apache Tribe of Mescalero Reservation,* 673 F.2d 315 (10th Cir.1982), where we held that tribal sovereign immunity barred a suit pursuant to the ICRA brought by a non-Indian in federal court to settle a contract dispute with the Apache Tribe, even though the plaintiff alleged lack of access to tribal courts. The plaintiff relied heavily on *Dry Creek Lodge,* but we held it distinguishable because "[t]hat case involved particularly egregious allegations of personal restraint and deprivation of personal rights that are not present in this action." *Id.* at 319 n. 4. We thereby suggested that the exception to tribal sovereign immunity outlined in *Dry Creek Lodge* is applicable only in cases with similar facts. It is thus clear that tribal sovereign immunity may preclude federal court jurisdiction over non-Indian complaints brought under the ICRA even if tribal remedies are unavailable.

(1985); *Snow v. Quinault Indian Nation,* 709 F.2d 1319 (9th Cir.1983), *cert. denied,* 467 U.S. 1214, 104 S.Ct. 2655, 81 L.Ed.2d 362 (1984). Although both of those cases state in dicta that tribal immunity does not bar " 'actions which allege conduct that is determined to be outside the scope of a tribe's sovereign powers,' " *Hardin,* 761 F.2d at 1287 (quoting *Snow,* 709 F.2d at 1321), the Ninth Circuit has subsequently repudiated this theory. The *Hardin* decision upon which plaintiffs rely was superseded by an opinion which omits the above statement from the sovereign immunity discussion. *See Hardin v. White Mountain Apache Tribe,* 779 F.2d 476, 478–79 (9th Cir.1985). More significantly, in *Chemehuevi Indian Tribe v. California State Bd. of Equalization,* 757 F.2d 1047, 1052 (9th Cir.), *rev'd per curiam on other grounds,* 474 U.S. 9, 106 S.Ct. 289, 88 L.Ed.2d 9 (1985), the Ninth Circuit characterized the statement in *Snow* as "apparently inadvertently" misapplying the law. The court went on to hold that "[t]he tribe remains immune from suit regardless of any allegation that it acted beyond its authority or outside of its powers." *Id.*

We believe that *Snow* and the initial *Hardin* opinion are contary to the reasoning and holding of the Supreme Court in *Santa Clara Pueblo. See Merrion,* 617 F.2d at 540 ("[*Santa Clara Pueblo* ] clearly hold[s] a tribe cannot be sued absent consent.") In *Santa Clara Pueblo,* the Court adhered to the traditional doctrine of sovereign immunity even though the ICRA imposes substantive constraints on tribes. The underlying premise of the Court's ruling is that a tribe acting in derogation of the ICRA, and thus arguably beyond the scope of its sovereign powers, is nonetheless immune from suit absent a waiver of sovereign immunity. The Court implicitly refused to find a waiver arising solely from the alleged violation of the ICRA, requiring instead that an explicit waiver be found in some other source. Consistent with the Court's approach in *Santa Clara Pueblo,* we believe that the question before

this court must be whether the language of the 1866 Treaty constitutes a waiver.

The 1866 Treaty provides in relevant part "that all freedmen who have been liberated by voluntary act of their former owners or by law, ... and their descendants, shall have all the rights of native Cherokees." Treaty Between the United States of America and the Cherokee Nation of Indians, July 19, 1866, art. IX, 14 Stat. 799, 801. We are not persuaded that this language constitutes an "unequivocal expression" of waiver by the Cherokee Nation of its sovereign immunity. Like the provisions of the ICRA at issue in *Santa Clara Pueblo,* this provision only places substantive constraints on the Tribe, it does not waive the Tribe's immunity from a suit alleging noncompliance with these constraints.

### B. Suit Against Tribal Officials

■ Plaintiffs assert the same claims against the tribal officials that they raise against the Tribe.[6] Although sovereign immunity analysis differs with respect to tribal officials, we do not reach this issue because plaintiffs have failed to state any claims against these defendants.

As with plaintiffs' ICRA claims against the Tribe, we need look no farther than the Supreme Court's opinion in *Santa Clara Pueblo* and our decision in *Swimmer* to conclude that plaintiffs have failed to state a claim against the Cherokee tribal officials under the ICRA. The Supreme Court in *Santa Clara Pueblo,* expressly invoking concerns about preserving tribal autonomy and self-government, reasoned that the statutory scheme and the legislative history of Title I of the ICRA indicate Congress deliberately decided not to provide federal remedies other than habeas corpus in order to limit the Act's intrusion into tribal sovereignty. *Santa Clara Pueblo,* 436 U.S. at 59–72, 98 S.Ct. at 1677–84. For this reason, the Court held that other causes of action against tribal officials could not be implied from the ICRA. *Id.* at 69, 98 S.Ct. at 1682. In *Swimmer,* we rejected plain-

---

**6.** Indeed, plaintiffs have failed to distinguish the two classes of Indian defendants, the Tribe and tribal officials.

tiffs' efforts to secure federal relief against tribal officials for an alleged violation of the ICRA. The holdings in *Santa Clara Pueblo* and *Swimmer* preclude plaintiffs' claims against the Cherokee tribal officials.[7]

Plaintiffs' civil rights acts claims fare no better. Plaintiffs rely on 42 U.S.C. §§ 1985(3) and 1986, as did the plaintiffs in *Swimmer*. The analysis in that case controls resolution of those claims here. Plaintiffs must allege violations of independent substantive statutory or constitutional provisions to recover under sections 1985(3) and 1986 because those statutes only provide a remedy for the violation of substantive rights established elsewhere. *Swimmer*, 835 F.2d at 261–62. Plaintiffs must look to the ICRA as the source of their alleged entitlement to the rights and privileges of tribal membership, because federal constitutional protections extend to individual Indians only to the extent incorporated in the ICRA. *Id.* at 261; *see also Trans-Canada Enter. v. Muckleshoot Indian Tribes*, 634 F.2d 474, 476–77 (9th Cir.1980).

As this court observed in *Swimmer*, the "interest in preserving the inherent right of self-government in Indian tribes is equally strong" when suit is brought against individual officers of the tribal organization as when brought against the tribe itself. 835 F.2d at 262. Such considerations of tribal sovereignty, and the Supreme Court's emphasis in *Santa Clara Pueblo* on the availability of tribal forums to vindicate rights created by the ICRA, persuaded us that the ICRA does not pro-

vide an independent basis for suit under sections 1985(3) and 1986. " '[W]hen a tribal forum is available … the aggrieved party must seek relief in that forum.' " *Id.* at 262 (citation omitted).[8] Plaintiffs have thus failed to state a claim under sections 1985(3) and 1986.

The analysis in *Swimmer* is inapplicable to plaintiffs' claims under sections 1981[9] and 2000d[10], because those sections do create independent substantive rights. We must therefore determine whether these statutes apply to the tribal officials under the circumstances in the present case.

The Supreme Court has stated in dictum that "a general statute in terms applying to all persons includes Indians and their property interests." *Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 116, 80 S.Ct. 543, 553, 4 L.Ed.2d 584 (1960); *but see EEOC v. Cherokee Nation*, 871 F.2d 937, 938 n. 3 (10th Cir. 1989) (noting question as to "continuing vitality of the *Tuscarora* dictum in light of the Supreme Court's decision in *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982)"). Lower courts have recognized three exceptions to the *Tuscarora* rule.

"A federal statute of general applicability that is silent on the issue of applicability to Indian tribes will not apply to them if: (1) the law touches 'exclusive rights of self-governance in purely intramural-matters'; (2) the application of the law to the tribe would 'abrogate rights guaranteed by Indian treaties'; or (3) there is proof 'by legislative history or

---

7. We need not address plaintiffs' argument that the Cherokee Constitution waives the tribal officials' immunity from suits brought pursuant to the ICRA because there is no federal cause of action against them under the ICRA.

8. Plaintiffs argue that pursuing tribal remedies would be futile. As the district court observed, however, alleging futility of tribal remedies does not eliminate the barrier of tribal sovereign immunity. *See White v. Pueblo of San Juan*, 728 F.2d 1307, 1312 (10th Cir.1984).

9. Section 1981 provides:
  "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce

contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
  42 U.S.C. § 1981 (1982).

10. Section 2000d provides:
  "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."
  42 U.S.C. § 2000d (1982).

some other means that Congress intended [the law] not to apply to Indians on their reservations....' In any of these three situations, Congress must *expressly* apply a statute to Indians before we will hold that it reaches them."

*Donovan v. Coeur d'Alene Tribal Farm,* 751 F.2d 1113, 1116 (9th Cir.1985) (quoting *U.S. v. Farris,* 624 F.2d 890, 893–94 (9th Cir.1980), *cert. denied,* 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 839 (1981)); *see also Smart v. State Farm Ins. Co.,* 868 F.2d 929, 932 (7th Cir.1989). Neither section 1981 nor section 2000d is expressly applicable to Indian tribes. Accordingly, these statutes may not be invoked against the tribal officials here if the facts of this case fall within one of the above exceptions.

We conclude that allowing plaintiffs to assert claims under sections 1981 and 2000d would affect the Tribe's right to self-governance in a purely internal matter. Under the first exception set forth above, therefore, the statutes do not apply. Plaintiffs in essence assert that defendants have discriminated on the basis of race by refusing to accord them tribal membership and its privileges and benefits. Plaintiffs argue that they state a claim for relief under both section 1981 and section 2000d because these provisions prohibit race discrimination. However, no right is more integral to a tribe's self-goverance than its ability to establish its membership. "A tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community." *Santa Clara Pueblo,* 436 U.S. at 72 n. 32, 98 S.Ct. at 1684 n. 32; *see also Montana v. United States,* 450 U.S. 544, 564, 101 S.Ct. 1245, 1257, 67 L.Ed.2d 493 (1981); *United States v. Wheeler,* 435 U.S. 313, 322 n. 18, 98 S.Ct. 1079, 1085 n. 18, 55 L.Ed.2d 303 (1978). Applying the statutory prohibitions against race discrimination to a tribe's designation of tribal members would in effect eviscerate the tribe's sovereign power to define itself, and thus would constitute an unacceptable interference "with a tribe's ability to maintain itself as a culturally and politically distinct entity." *Santa Clara Pueblo,* 436 U.S. at 72, 98 S.Ct. at 1684. We

thus hold that plaintiffs have failed to state a claim under sections 1981 and 2000d.

## II.

### A. Suit Against the United States and its Agencies

As the Supreme Court observed in *United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983), "[i]t is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *See also* 14 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3654 at 186–90 (1985). Moreover, Congress may impose conditions on the government's waiver of immunity. *See, e.g., Stubbs v. United States,* 620 F.2d 775, 779 (10th Cir.1980). Plaintiffs raise three arguments on appeal in an attempt to avoid the jurisdictional barrier of sovereign immunity to their requests for monetary and injunctive relief against the United States.

■ First, plaintiffs assert that they are entitled to proceed under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671–2680 (1982), to recover compensatory damages. Congress waived the United States' immunity from suit in a certain class of cases when it enacted the FTCA, but Congress imposed certain conditions on this waiver. Section 2675 of the FTCA requires that administrative remedies be exhausted before suit is filed in district court. Plaintiffs contend that they did not pursue their administrative remedies because they believed doing so would be futile. However, bringing an administrative claim is a jurisdictional prerequisite to suit, imposed by Congress, which the courts have no power to waive. *See Lurch v. United States,* 719 F.2d 333, 335 n. 3 (10th Cir.1983), *cert. denied,* 466 U.S. 927, 104 S.Ct. 1710, 80 L.Ed.2d 182 (1984). The district court properly held that plaintiffs' failure to exhaust created a jurisdictional bar under the FTCA. *See Colorado Flying Academy v. United States,* 724 F.2d 871, 874 n. 9 (10th Cir.1984), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986).

Plaintiffs next argue that they may pursue their claim against the United States on the basis of a trust relationship between the United States and the Cherokee freedmen arising from their status as Cherokees. Relying on *Mitchell*, 463 U.S. 206, 103 S.Ct. 2961, plaintiffs contend that this trust relationship exempts their claims for monetary relief from the sovereign immunity barrier. In *Mitchell*, Quinault Indians sought damages from the United States under the Tucker Act, 28 U.S.C. § 1491 (1982), and its counterpart for claims brought by Indian tribes, the Indian Tucker Act, 28 U.S.C. § 1505 (1982).[11] The plaintiffs claimed that the United States had breached its trust duty to them by mismanaging timberlands on the Quinault Reservation. The Supreme Court concluded that the plaintiffs were entitled to recover damages from the United States. To reach this result, the Court first had to determine whether the United States had consented to suit, thereby waiving its sovereign immunity. A review of the legislative history of the two Tucker Acts, and cases interpreting them, convinced the Court that the Acts constituted a waiver of sovereign immunity, so that "[i]f a claim falls within the terms of the Tucker Act, the United States has presumptively consented to suit." 463 U.S. at 216, 103 S.Ct. at 2967.[12]

Even assuming that plaintiffs' claims here fall within the Tucker Act, that Act would provide a waiver of sovereign immunity in the Claims Court, but not in district court.

"The Tucker Act (codified at 28 U.S.C. §§ 1346, 1491) grants concurrent jurisdiction to the district court and the Claims Court (formerly the Court of Claims) over money claims against the United States not exceeding $10,000. For claims against the United States involving amounts greater than $10,000 founded upon the Constitution, Acts of Congress, executive regulations, or contracts, the Act vests exclusive jurisdiction with the Claims Court."

*State of New Mexico v. Regan*, 745 F.2d 1318, 1322 (10th Cir.1984); *see also Rogers v. Ink*, 766 F.2d 430, 433 (10th Cir.1985).

In this case, plaintiffs seek both monetary damages in the amount of $250,000,000, and injunctive and declaratory relief. "[W]hen the 'prime objective' or 'essential purpose' of the complaining party is to obtain money from the federal government (in an amount in excess of $10,000), the Claims Court's exclusive jurisdiction is triggered." *Regan*, 745 F.2d at 1322; *see also Rogers*, 766 F.2d at 434. That recovering money damages is the primary objective of plaintiffs' suit against the federal government is demonstrated both by plaintiffs' reliance upon *Mitchell* and by their argument to this court. Plaintiffs assert on appeal:

"It is even more compelling to allow monetary relief in the instant case than it was in the case of *United States v. Mitchell*, supra. Here, appellants are not concerned with mismanagement of timber and natural resources (i.e., property rights), but rather with their right to vote (i.e., liberty interests). To limit the freedmen to merely prospective equitable remedies would be totally inadequate.

**11.** Section 1505 provides tribal plaintiffs access to the Court of Claims equivalent to that provided individual plaintiffs by section 1491.

**12.** Because the Tucker Act only provides a remedy, "[a] substantive right must be found in some other source of law, such as "the Constitution, or any Act of Congress, or any regulation of an executive department." *United States v. Mitchell*, 463 U.S. 206, 216, 103 S.Ct. 2961, 2967, 77 L.Ed.2d 580 (1983) (citation omitted). In *Mitchell*, the Court considered the statutes and regulations relevant to the government's management of Indian forests and timber resources to determine whether they could be interpreted to provide a cause of action for the breach of the duties they impose. The Court concluded that these provisions directly support the existence of a fiduciary relationship such that the "Government should be liable for the breach of its fiduciary duties." 436 U.S. at 226, 103 S.Ct. at 2972–73. In the instant case, plaintiffs assert the government's breach of its general trust relation to the Indians as giving rise to a claim for damages. In view of our conclusion *infra* that the Claims Court has exclusive jurisdiction over this claim, we do not address this issue further with respect to the federal government.

"First, the freedmen are in no position to monitor the federal government's actions in administering the government-to-government relations between it and the Indian tribes and in carrying out its trust responsibility.

"Second, a prospective equitable remedy does little to compensate the freedmen for the embarrassment, humiliation, anxiety and shame which accompanied their disenfranchisement from the Cherokee Nation and little to deter the federal government from breaching their trust responsibility and allowing such unlawful tribal actions in the future. For these reasons, appellants contend that the reasoning of *United States v. Mitchell,* supra., should be applied to the case at bar and that this court permit plaintiffs to bring suit against the United States for monetary relief."

Brief of Appellants at 35–36. We therefore conclude that under the Tucker Act the district court was without subject matter jurisdiction over plaintiffs' claims against the federal government based on *Mitchell.*

### B. Suit Against Federal Officials

Plaintiffs assert claims against the federal officials individually for breach of the government's trust relationship with its Indian citizens. Plaintiffs also allege claims under *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), for the denial of their alleged constitutional right to vote in the 1983 Cherokee tribal elections. The basis of both the breach-of-trust claims and the *Bivens* claims is the failure of these defendants to intervene in the alleged discriminatory tribal election process. The trial court granted defendants' motion for summary judgment on the basis of qualified immunity. We affirm, concluding instead that plaintiffs have failed to state a claim against these defendants.

In *Wheeler v. United States Dept. of the Interior,* 811 F.2d 549 (10th Cir.1987), we explicitly rejected plaintiffs' argument that the federal government's general trust responsibilities impose a duty on these federal officials to involve themselves in the tribal election. As in this case, the plaintiffs in *Wheeler,* argued that the government

"has a duty to protect the Cherokee Indians' right to self-government and that to do so, it must step in under authority of its general trust responsibilities, as it did in *United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), and *Milam v. United States Department of Interior,* 10 Indian L.Rep. (Am. Indian Law. Training Program) 3013, No. 82–3099 (D.D.C. Dec. 23, 1982)."

*Id.* at 552. We distinguished *Mitchell* as a case involving federal statutes and regulations requiring government action with respect to a specific trust corpus. *Id.* at 553. In contrast, in *Wheeler* and the instant case there is "no corpus, and no statute or regulation requires Department involvement in Cherokee election disputes; rather, as noted previously, federal law precludes Department action." *Id.* We distinguished *Milam* as involving a tribe which, contrary to the Cherokee Nation, had no tribal forum for interpreting tribal law, thus requiring the Department to interpret the tribal constitution "in order to determine which government it should recognize in its interactions." *Id.*

Our conclusion in *Wheeler* that the plaintiffs had no cause of action based on the government's non-intervention in the tribal election process is equally applicable to plaintiffs' claims against the federal officials here.

"Indian tribes have a right to self-government, and the Federal Government encourages tribes to exercise that right. Consequently, while the Department may be required by statute or tribal law to act in intratribal matters, it should act so as to avoid any unnecessary interference with a tribe's right to self-government. Plaintiffs have not cited, and we have not found, any federal statute or any provision of Cherokee law that requires the Department to intervene in a Cherokee election dispute. Rather, the Cherokee Nation provides a tribal forum for resolving such disputes.

Consequently, the Department has no authority to take action contrary to the tribal resolution of such disputes. In the present case, the Department does not have authority to invalidate the Cherokee election, and the courts have no authority to order the Department to grant such relief."

*Id.*[13]

Plaintiffs' remaining claims, to the extent they are pursued on appeal, are implicitly resolved adversely to plaintiffs by the holdings we articulate in this opinion.

AFFIRMED.

---

13. We believe that the above holding is dispositive of plaintiffs' alleged constitutional claims under *Bivens.* In any event, as discussed above at 13–14, federal constitutional protections extend to individual Indians only to the extent incorporated by the ICRA, which does not provide a cause of action for its violation under the circumstances here.