# Applicability of Section 504 of the Rehabilitation Act to Tribally Controlled Schools

Section 504 of the Rehabilitation Act generally applies to tribally controlled schools that receive federal financial assistance from the Department of Justice.

November 16, 2004

MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL
OFFICE OF JUSTICE PROGRAMS

You have asked us whether section 504 of the Rehabilitation Act, 29 U.S.C. § 794 (2000), generally applies to tribally controlled schools that receive federal financial assistance from the Department of Justice. We conclude that it does.[1]

## I.

We begin our analysis with an overview of the relevant interpretive principles. The Supreme Court "ha[s] stated time and again" that we "must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (citations omitted). When addressing the effects of statutes governing Indian tribes, however, the Court has articulated two additional canons of construction. First, in what is really a variation of the plain meaning rule, the Court has said that "it is now well settled by many decisions of th[e] [Supreme] Court

---

[1] The original opinion request, sent to us by your predecessor, framed the question as "whether the doctrine of tribal sovereign immunity" would prevent the Office of Justice Programs from investigating an allegation of discrimination by a tribal school. *See* Memorandum for Randolph D. Moss, Assistant Attorney General, Office of Legal Counsel, from Mary Lou Leary, Acting Assistant Attorney General, Office of Justice Programs, *Re: Request for Office of Legal Counsel Review* (Nov. 29, 2000). The doctrine of tribal sovereign immunity, however, is inapplicable to investigations brought by the federal Government. *See, e.g.*, *United States v. Red Lake Band of Chippewa Indians*, 827 F.2d 380, 382–83 (8th Cir. 1987); *Fla. Paraplegic Ass'n v. Miccosukee Tribe*, 166 F.3d 1126, 1134–35 (11th Cir. 1999); *Quileute Indian Tribe v. Babbitt*, 18 F.3d 1456, 1459–60 (9th Cir. 1994). We therefore address whether section 504 of the Rehabilitation Act generally applies to tribally controlled schools. We have also solicited the views of other components of the Department of Justice and agencies that would be affected by this opinion. *See* Memorandum for Daniel L. Koffsky, Acting Assistant Attorney General, Office of Legal Counsel, from Ralph F. Boyd, Jr., Assistant Attorney General, Civil Rights Division, *Re: Applicability of Certain Civil Rights Statutes to Indian Tribes and Tribally-Operated Entities* (Aug. 21, 2001); Memorandum for Leslie Simon, Attorney-Adviser, Office of Legal Counsel, from Timothy W. Joranko, Deputy Director, Office of Tribal Justice, *Re: Applicability of Civil Rights Statutes to Indian Tribes and Tribally-Operated Entities* (Sept. 20, 2001); Letter for Daniel L. Koffsky, Acting Assistant Attorney General, Office of Legal Counsel, from Steve Winnick, Deputy General Counsel, Dep't of Education (Aug. 17, 2001). (The Department of the Interior and the Environmental Protection Agency did not provide formal views in response to our request.)

that a general statute in terms applying to all persons includes Indians and their property interests." *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 116 (1960). Thus, it is an established "rule[] . . . that general Acts of Congress apply to Indians as well as to all others in the absence of a clear expression to the contrary." *Id*. at 120. *See also Superintendent of Five Civilized Tribes v. Comm'r of Internal Revenue*, 295 U.S. 418, 420 (1935) (upholding application of federal income tax to Indians where "[t]he terms of the . . . Act are very broad, and nothing there indicates that Indians are to be excepted"). Second, the Supreme Court has also recognized "a principle deeply rooted in this Court's Indian jurisprudence: '[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'" *Cnty. of Yakima v. Confederated Tribes*, 502 U.S. 251, 268–69 (1992) (quoting *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985)).

At first blush, one might think these two canons to be in tension: On the one hand, general statutes apply to Indians unless they are expressly excluded, while on the other, any statutory ambiguities should be construed to the benefit of Indians. In fact, however, they are easily reconciled. A generally worded statute the plain terms of which naturally encompass Indian tribes or tribal entities is not ambiguous, and a statute that is ambiguous as to whether it encompasses Indian tribes is not a generally worded statute the plain terms of which naturally encompass Indian tribes. *See South Carolina v. Catawba Indian Tribe*, 476 U.S. 498, 506 (1986) ("The canon of construction regarding the resolution of ambiguities in favor of Indians . . . does not permit reliance on ambiguities that do not exist . . ."); *Chickasaw Nation v. United States*, 534 U.S. 84, 88–89 (2001) (declining to find ambiguity despite poor drafting of statute). In other words, a broad statute the terms of which naturally encompass Indian tribes is unambiguously broad, and so unambiguously encompasses Indian tribes. In such a case, the ambiguity-resolving canon is simply inapplicable.

The cases setting forth these two canons are illustrative. Those applying the former rule—*viz.*, that general statutes apply to Indian tribes unless specifically excepted—involve broad but unambiguous statutory language. *Tuscarora*, for example, held that tribally owned lands were subject to the eminent domain powers of the Federal Power Act, which authorized the condemnation of "'the *lands or property of others* necessary to the construction, maintenance, or operation'" of licensed development projects. *Tuscarora*, 362 U.S. at 115 (quoting section 21 of the Federal Power Act) (emphasis added). As the Court explained, "[t]hat section does not exclude lands or property owned by Indians, and, upon the authority of the cases cited, we must hold that it applies to these lands owned in fee simple by the Tuscarora Indian Nation." *Id.* at 118. Likewise, *Choteau v. Burnet*, 283 U.S. 691 (1931), held that the Revenue Act, which "subjects the income of '*every individual*' to tax" and "includes income '*from any source whatever*,'" *id.* at 693, 694 (quoting the Revenue Act) (emphases added), applied to the income of an Indian derived from his shares in the oil and gas leases of an

Indian tribe, observing that "[t]he intent to exclude must be definitely expressed, where, as here, the general language of the Act laying the tax is broad enough to include the subject-matter," *id.* at 697. *See also Superintendent of Five Civilized Tribes*, 295 U.S. at 419–20 (holding that an Indian's income derived from tribal lands was subject to the Revenue Act) (citing *Choteau*); *Henkel v. United States*, 237 U.S. 43, 49 (1915) (holding that Secretary of the Interior could purchase or condemn Indian-owned land pursuant to the Reclamation Act of 1902, which authorized him "'to acquire [by purchase or condemnation] *any rights or property*'" necessary to carry out the provisions of the Act and "'to perform *any and all acts* . . . necessary and proper for the purpose of carrying the provisions of this act . . . into effect'") (quoting Reclamation Act of 1902) (emphases added); *Okla. Tax Comm'n v. United States*, 319 U.S. 598, 600, 607 (1943) (holding that the estate of an Oklahoma Indian was subject to state inheritance and estate taxes; noting that "[t]he language of the statutes does not except either Indians or any other persons from their scope" and that "[i]f Congress intends to prevent the State of Oklahoma from levying a general non-discriminatory estate tax applying alike to all its citizens, it should say so in plain words").

In contrast, the Supreme Court's cases applying the latter ambiguity-resolving canon did not involve broad statutes of general application, but rather, statutes or treaties that the Court actually regarded as ambiguous as to their application to particular Indians. In *Yakima*, for example, the Court concluded that a statute that authorized a state to subject certain Indian-owned land to state "'taxation of . . . land,'" 502 U.S. at 258 n.1 (quoting 25 U.S.C. § 349), did not authorize the state to subject such land to an "excise tax on *sales* of fee land," *id.* at 268 (emphasis added). Justice Scalia, writing for the Court, explained:

> [T]he General Allotment Act explicitly authorizes only "taxation of . . . land," not "taxation with respect to land," "taxation of transactions involving land," or "taxation based on the value of land." Because it is eminently reasonable to interpret that language as not including a tax upon the sale of real estate, our cases require us to apply that interpretation for the benefit of the Tribe.

*Id.* at 269. Likewise, in *Bryan v. Itasca County*, 426 U.S. 373 (1976), the Court held that the statute that gave the "'*civil laws of such State* . . . *that are of general application* . . . the same force and effect within such Indian country as they have elsewhere,'" *id.* at 377 (quoting 28 U.S.C. § 1360(a)), did not allow a state to impose its tax laws on reservation Indians. Read in the context of a statute that was intended "to redress the lack of adequate Indian forums for resolving private legal disputes between reservation Indians, and between Indians and other private citizens, by permitting the courts of the States to decide such disputes," the Court concluded that the emphasized phrase merely "authorize[d] application by the state courts of their rules of decision to decide such disputes." *Id.* at 383–84. And in

*Montana v. Blackfeet Tribe*, 471 U.S. 759, 767–68 (1985), the Court held that a 1938 statute that repealed "'[a]ll . . . or parts of Acts inconsistent herewith,'" *id.* at 764 (quoting the 1938 Act), did not leave intact a 1924 statute authorizing states to tax the income from Indian oil and gas leases: the 1938 Act's repealer clause, the Court explained, "[could not] be taken to incorporate consistent provisions of earlier laws," *id.* at 767. *See also id.* at 767–68 ("The tax proviso in the 1924 Act states that 'the production of oil and gas and other minerals on such lands may be taxed by the State in which said lands are located . . . .' Even applying ordinary principles of statutory construction, 'such lands' refers to '[u]nallotted land . . . subject to lease for mining purposes . . . under section 397 [the 1891 Act].' When the statute is 'liberally construed . . . in favor of the Indians,' it is clear that if the tax proviso survives at all, it reaches only those leases executed under the 1891 Act and its 1924 amendment.") (citations omitted). In the same vein, the Court has refused to resort to the ambiguity-resolving canon in the face of unambiguous statutory language. *See, e.g.*, *Negonsott v. Samuels*, 507 U.S. 99, 110 (1993) (declining to apply ambiguity-resolving canon where a federal statute "quite unambiguously confers jurisdiction on the State" to prosecute Indians for violations of state criminal law).

This point, that ambiguity-resolving canons do not overcome unambiguously broad statutory text, is further illustrated in a Supreme Court case discussing a similar—though even more restrictive—canon of construction: that "absent an 'unmistakably clear' expression of intent to 'alter the usual constitutional balance between the States and the Federal Government,' we will interpret a statute to preserve rather than destroy the States' 'substantial sovereign powers.'" *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 208–09 (1998). In *Yeskey*, the Court addressed the applicability of the Americans with Disabilites Act ("ADA") to state prisons, concluding that even though state prisons were nowhere specifically mentioned in the ADA, the statute's broad terms were unambiguous. The Court found that the broadly defined term "public entity," which included "'any department, agency, special purpose district, or other instrumentality of a State or States or local government,'" *id.* at 210 (quoting 42 U.S.C. § 12131(B)), "plainly covers state institutions *without* any exception that could cast the coverage of prisons into doubt." *Id.* at 209. It likewise rejected the contention that prisons do not provide to prisoners the "benefits of the services, programs, or activities of a public entity," *id.* at 210 (quoting 42 U.S.C. § 12132): "Modern prisons," the Court explained, "provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in')." *Id. See also id.* at 210–11 (rejecting argument that the term "qualified individual with a disability" was ambiguous as applied to prisoners).

In short, ambiguity-resolving canons do not overcome a broad but otherwise unambiguous statutory command. To the contrary, a broad, generally worded

statute the plain terms of which naturally encompass Indians should normally be deemed to so apply unless Indians are expressly excluded from its application.

## II.

With these general principles in mind, we now turn to applying them to section 504 of the Rehabilitation Act. Section 504 provides:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any *program or activity* receiving Federal financial assistance or under any *program or activity* conducted by any Executive agency.

29 U.S.C. § 794(a) (emphases added). The question we must resolve is whether a federally funded, tribally controlled school is a "program or activity" within the meaning of this statute.

Applying standard canons of statutory construction, we believe that a "program or activity" under section 504 unambiguously encompasses tribally controlled schools. Section 504 defines a "program or activity" to include, among other things, "all of the operations of" (1) "a local educational agency (as defined in section 7801 of Title 20), system of vocational education, or *other school system*," 29 U.S.C. § 794(b)(2)(B) (emphasis added); and (2) a "college, university, or other postsecondary institution." *Id.* § 794(b)(2)(A).[2] These terms—"other school system," "other postsecondary institution"—are broadly phrased and admit of no

---

[2] The full definition of a "program or activity" is as follows:

> For the purposes of this section, the term 'program or activity' means all of the operations of—(1) (A) a department, agency, special purpose district, or other instrumentality of a State or local government; or (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government; (2)(A) a college, university, or other postsecondary institution, or a public system of higher education; or (B) a local educational agency (as defined in section 7801 of Title 20), system of vocational education, or other school system; (3)(A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship—(i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or (ii) which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or (B) the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship; or (4) any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3); any part of which is extended Federal financial assistance.

29 U.S.C. § 794(b).

exception for such entities merely because they are controlled by Indian tribes. Congress, in fact, has used the precise phrase "school system" in other statutes to refer to schools that receive funding from the Bureau of Indian Affairs ("BIA"), including those that are tribally controlled, thus confirming that such schools are covered under the Rehabilitation Act. *See, e.g.*, 20 U.S.C.A. § 6316(g)(4) (West 2003) (corrective action must "take into account the unique circumstances and structure of the Bureau of Indian Affairs-funded *school system*"); 25 U.S.C.A. § 2000 (West Supp. 2003) (acknowledging federal Government responsibility for the "Bureau of Indian Affairs funded *school system*").

We do not mean to say that *every* tribally controlled school would automatically fall within these terms. To be sure, we would expect that most tribally controlled primary and secondary schools would be part of a "system of vocational education" or "other school system," and a tribally controlled school of higher education would quite obviously be a "college, university, or other postsecondary institution." But we at least acknowledge the theoretical possibility that some individual primary or secondary schools might not be considered part of an overall "school *system*." 29 U.S.C. § 794(b)(2)(B) (emphasis added). While such a school might nevertheless fall within another category of "program[s] or activit[ies]"—a term that includes "an entire corporation, partnership, or other private organization, or an entire sole proprietorship . . . which is principally engaged in the business of providing education," *id.* § 794(b)(3)(A)(ii)—and thus still be covered by section 504, it would be imprudent for us to draw such a conclusion as a general matter outside the context of a specific case. For now, it is enough to say that the general definition of a "program or activity" extends to tribally controlled schools, provided that such schools meet the other specific requirements of that definition.

Our conclusion that under standard principles of construction section 504 of the Rehabilitation Act covers tribally controlled schools is confirmed by the numerous other statutes that reflect this precise understanding. "[S]ubsequent legislation declaring the intent of an earlier statute," the Supreme Court has explained, "is entitled to great weight in statutory construction." *Loving v. United States*, 517 U.S. 748, 770 (1996) (citations omitted).[3] And here, Congress has consistently expressed in statutes its understanding of the scope of section 504. The Education Amendments of 1978, for example, directed the Secretary of the Interior to "immediately begin to bring all schools, dormitories, and other facilities operated by the Bureau [of Indian Affairs] or under contract with the Bureau in connection

---

[3] Although subsequent legislation is entitled to great weight in statutory interpretation, the same is not true of the legislative history that accompanies the subsequent legislation. "With respect to subsequent legislation, . . . Congress has proceeded formally through the legislative process. A mere statement in a conference report of such legislation as to what the Committee believes an earlier statute meant is obviously less weighty." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n.13 (1980).

with the education of Indian children into compliance with . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794).” Pub. L. No. 95-561, § 1125, 92 Stat. 2143, 2319 (1978). Congress recently reiterated this position in the No Child Left Behind Act of 2001, Pub. L. No. 107-110, 115 Stat. 1425 (2002), which requires that “[t]he Secretary shall immediately begin to bring all schools, dormitories, and other Indian education-related facilities operated by the Bureau or under contract or grant with the Bureau, into compliance with . . . section 794 of Title 29 [section 504]; and . . . the Americans with Disabilities Act of 1990.” 25 U.S.C.A. § 2005(b)(1) (West Supp. 2003). *Cf.* 25 U.S.C.A. § 4131(b)(6) (West Supp. 2003) (providing explicit exemption from the broad anti-discrimination requirements of Title VI for “actions by federally recognized tribes and the tribally designated housing entities of those tribes” under the Native American Housing Assistance and Self-Determination Act of 1996). These provisions serve to confirm what the plain text of section 504 otherwise dictates: that tribally controlled schools are covered by its requirements.

Before moving on, we pause to address a possible counter-argument. The definition of the term “local educational agency” that is incorporated in 29 U.S.C. § 794(b)(2)(B)’s definition of “program or activity” specifically includes certain tribally controlled schools, but only for a limited purpose. In particular, the Elementary and Secondary Education Act defines “[l]ocal educational agency” as including:

> an elementary school or secondary school funded by the Bureau of Indian Affairs *but only to the extent that* including the school makes the school eligible for programs for which specific eligibility is not provided to the school in another provision of law and the school does not have a student population that is smaller than the student population of the local educational agency receiving assistance under this chapter with the smallest student population, except that the school shall not be subject to the jurisdiction of any State educational agency other than the Bureau of Indian Affairs.

20 U.S.C.A. § 7801(26)(C) (West 2003) (emphasis added). It could be argued that because at least some tribally controlled schools—*viz.*, “elementary school[s] or secondary school[s] funded by the Bureau of Indian Affairs,” *id.*—are “local educational agenc[ies],” Congress did *not* intend them also to be included as an “other school system,” else inclusion in the former would be superfluous. *See United States v. Menasche*, 348 U.S. 528, 538–39 (1955) (“It is our duty ‘to give effect, if possible, to every clause and word of a statute.’”) (quoting *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883)). The syllogism, in other words, would run as follows: (1) a tribally controlled school is a “program or activity” only to the extent that it is a “local educational agency”; (2) a tribally controlled school is a “local educational agency” “*only to the extent that* including the school” in the

definition of a "local educational agency" renders it eligible to receive certain funds for which it would otherwise be ineligible; and (3) therefore, a tribally controlled school is *not* a "local educational agency," and hence, *not* a "program or activity," for any other purpose, including section 504's substantive anti-discrimination provisions.

We find this argument highly strained and implausible. The inclusion of BIA-funded schools generally within the term "other school system" in section 504 does not render superfluous the inclusion of some BIA-funded schools in the generally applicable definition of "local educational agency." Their inclusion in that latter definition serves a specific function: It gives BIA-funded schools access to non-BIA funds for which only local educational agencies are eligible and for which, absent this definition, BIA-funded schools would be ineligible. *See, e.g.*, 20 U.S.C.A. § 1413 (2000 & West Supp. 2003) (local educational agencies eligible for assistance for educating children with disabilities); 20 U.S.C.A. § 6302 (West 2003) (authorization of grants to local educational agencies). At the same time, this definition prevents BIA-funded schools from double-dipping into funds for which *both* local educational agencies *and* BIA-funded schools are eligible. *See, e.g.*, 20 U.S.C.A. § 7269(a) (West 2003) (authorizing grants, contracts, and co-operative agreements with "State educational agencies, local educational agencies, or Indian tribes, for the purpose of increasing student access to quality mental health care"); 20 U.S.C.A. § 7253c(a)(1) (West 2003) (authorizing grants and contracts with "State educational agencies, local educational agencies, institutions of higher education, other public agencies, and other private agencies and organizations (including Indian tribes and Indian organizations . . .) to assist . . . in carrying out programs or projects . . . designed to meet the educational needs of gifted and talented students"). In contrast, inclusion of tribally controlled schools in the "other school system" prong of the Rehabilitation Act's definition of "program or activity" serves the entirely separate purpose of rendering these schools subject to that Act's substantive requirements.[4] Each provision, in other

---

[4] We note that the statutory and legislative history of this provision is consistent with our conclusion. The Rehabilitation Act's definition of "program or activity" has long included "local educational agencies" as defined in the Elementary and Secondary School Act. Prior to 1994, however, the definition of "local educational agency" ("LEA") in the Elementary and Secondary School Act made no mention of Indian tribes or BIA-funded schools. The Improving America's Schools Act of 1994 ("IASA") amended this definition to extend to BIA-funded schools for the sole purpose of allowing such schools to receive federal funds for which they would otherwise not be eligible. *See* Pub. L. No. 103-382, § 101, 103 Stat. 3518, 3889 (1994); 20 U.S.C. § 8801(18)(C) (1994); *see also* 140 Cong. Rec. 27,842, 27,848 (1994) (remarks of Sen. Kennedy) ("Under current law, Bureau schools are not covered by the definition of LEA, so, except for a few programs in which they have been specifically included, these schools could not benefit from the wide range of Federal grants and services available to public schools through the eligibility of their LEA's. . . . The first provision defines virtually all Bureau funded schools as LEA's, except in those cases where a specific statute already makes provision for their eligibility, as in Chapter 1 and Even Start. This exception ensures that there is no double benefit for Bureau schools.").

words, serves a separate and independent function, and neither provision renders the other superfluous.

Accordingly, we conclude that under standard canons of statutory construction, section 504 of the Rehabilitation Act would encompass tribally controlled schools.[5]

## III.

The conclusions above have rested on the application of the standard principles of construction described in Part I, *supra.* Several courts of appeals, however, have applied yet another canon of construction. These courts have found an exception to the *Tuscarora* rule for a statute that "touches 'exclusive rights of self-governance in purely intramural matters,'" unless the law specifically references Indian tribes. *Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113, 1116 (9th Cir. 1985) (citation omitted).[6] In such a case, these courts have explained, the *Tuscarora* rule is inapplicable, and instead, the generally worded statute is deemed *not* to apply to Indian tribes unless it explicitly states to the contrary.[7] As described in Part III.A,

---

[5] Nor are tribally controlled schools exempt from the Rehabilitation Act under the Tribally Controlled Schools Act of 1988 ("TCSA"), 25 U.S.C.A. §§ 2501–2511 (2001 & West Supp. 2004). The TCSA provides, in relevant part, that "[f]unds allocated to a tribally controlled school . . . shall be subject to the provisions of this chapter and shall not be subject to any additional restriction, priority, or limitation that is imposed by the Bureau [of Indian Affairs] with respect to funds provided under—(i) title I of the Elementary and Secondary Education Act of 1965; (ii) the Individuals with Disabilities Education Act; or (iii) *any Federal education law* other than title XI of the Education Amendments of 1978," and that "Indian tribes and tribal organizations to which grants are provided under this part, and tribally controlled schools for which such grants are provided, shall not be subject to any requirements, obligations, restrictions, or limitations imposed by the Bureau that would otherwise apply solely by reason of the receipt of funds provided under any law referred to in clause (i), (ii), or (iii)." 25 U.S.C. § 2503(b)(1) (emphasis added). According to the Departments of Education and the Interior, this provision simply means "that the BIA cannot impose additional requirements under Title I, IDEA and other federal education laws beyond what is required in the federal law." Letter for Noel J. Francisco, Deputy Assistant Attorney General, Office of Legal Counsel, from Brian W. Jones, General Counsel, Dep't of Education at 2 (July 15, 2004); *see also* Letter for Noel J. Francisco, Deputy Assistant Attorney General, Office of Legal Counsel, from Christopher B. Chaney, Associate Solicitor, Dep't of the Interior (Sept. 14, 2004) (agreeing with the Department of Education on this point). In addition, the Rehabilitation Act is not a "Federal education law," any more so than would be a law that generally prohibits robbery, including robberies that take place on school grounds. It is, rather, a general antidiscrimination law that applies to a broad range of institutions, including schools, and to all federal financial assistance programs, not just those administered by the BIA under federal education laws.

[6] *See, e.g., Fla. Paraplegic Ass'n*, 166 F.3d at 1129; *Smart v. State Farm Ins. Co.*, 868 F.2d 929, 935 & n.5 (7th Cir. 1989); *Reich v. Mashantucket Sand & Gravel*, 95 F.3d 174, 175, 179 (2d Cir. 1996); *Nero v. Cherokee Nation of Okla.*, 892 F.2d 1457, 1462–63 (10th Cir. 1989); *EEOC v. Fond du Lac Heavy Equip. & Constr. Co.*, 986 F.2d 246, 249 (8th Cir. 1993).

[7] These courts have also recognized two other "exceptions" to the *Tuscarora* rule: (1) where "the application of the law to the tribe would 'abrogate rights guaranteed by Indian treaties'"; and (2) where "there is proof 'by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations.'" *Coeur d'Alene Tribal Farm*, 751 F. 2d at 1116. We do not address these applications of the rule except to note that they have a stronger basis than the one discussed in

*infra*, the basis for this exception is unclear. In any event, for the reasons described in part III.B, *infra*, we conclude that this canon is inapplicable to the question whether section 504 of the Rehabilitation Act extends to tribally controlled schools.

## A.

The Supreme Court has never explicitly adopted an exception to the *Tuscarora* rule for generally applicable statutes that "touch[] 'exclusive rights of self-governance in purely intramural matters.'" The "self-governance" exception appears to have originated in the Ninth Circuit's decision in *United States v. Farris*, 624 F.2d 890, 893 (9th Cir. 1980).[8] It has since been recognized by a number of courts of appeals, *see supra* note 6, though significantly, we are aware of only a few instances in which the self-governance exception has actually been applied to narrow an otherwise applicable generally worded statute.[9] It is unclear, however, whether this exception is consistent with Supreme Court precedent.

---

text. The first involves a conflict between two laws—an Indian treaty and a broadly worded statute; the choice to give one preference over the other is therefore unavoidable. *See, e.g.*, *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202–03 (1999) ("Congress may abrogate Indian treaty rights, but it must clearly express its intent to do so."). And the second exception involves nothing more than determining the statute's meaning by reference to its legislative history, which is different from limiting the otherwise plain reach of a statute's broad commands. Neither of these applications is here at issue, because we face no treaty with which section 504 of the Rehabilitation Act would conflict, nor any legislative history that would limit section 504's otherwise broad reach.

[8] In *Farris*, the court suggested that "reservation Indians may well have exclusive rights of self-governance in purely intramural matters, unless Congress has removed those rights through legislation explicitly directed at Indians." 624 F.2d at 893. As examples of such "purely intramural matters," the court subsequently listed "conditions of tribal membership, inheritance rules, and domestic relations." *Coeur d'Alene Tribal Farm*, 751 F.2d at 1116. As discussed below, *see infra* Part III.B, the Supreme Court has recognized tribal authority to regulate these three areas in the absence of federal law to the contrary. *See, e.g.*, *United States v. Wheeler*, 435 U.S. 313, 322 (1978). The Supreme Court, however, did not suggest that federal law overcomes such tribal authority only if it is explicitly directed at Indians.

[9] No court of appeals has addressed the application of the self-governance exception in the context of tribal schools. Most court of appeals cases have addressed whether a tribe's commercial activities fell within this exception, with the majority holding that they did not. *See Farris*, 624 F.2d at 893; *Fla. Paraplegic Ass'n*, 166 F.3d at 1129–30 (ADA applicable to tribally owned and operated restaurant and entertainment facility); *Coeur d'Alene Tribal Farm*, 751 F.2d at 1116 (OSHA applicable to tribally owned and operated farm); *Dep't of Labor v. Occupational Safety & Health Comm'n*, 935 F.2d 182, 186 (9th Cir. 1991) (OSHA applicable to tribally owned timber mill); *Smart*, 868 F.2d at 935 & n.5 (ERISA applicable to benefit plan of tribally owned health care center operating solely on reservation); *Mashantucket Sand & Gravel*, 95 F.3d at 175, 179 (OSHA applicable to tribally owned construction business that functioned as "an arm of the tribe"); *NLRB v. Chapa De Indian Health Program, Inc.*, 316 F.3d 995 (9th Cir. 2003) (NLRA applicable to contractor that provided health care to tribal members); *cf. United States v. Funmaker*, 10 F.3d 1327, 1332 (7th Cir. 1993) ("The decision-making power of Indian tribes ends . . . at the point when those decisions violate federal law designed to safeguard important federal interests"; finding that district court had jurisdiction to apply criminal law alleged to interfere with tribal self-governance). We are aware of just three cases in which courts of appeals have

The self-governance exception certainly seems to be in facial tension with the *Tuscarora* rule, which itself acknowledges no exception to the principle that "general Acts of Congress apply to Indians as well as to all others in the absence of a clear expression to the contrary." *Tuscarora*, 362 U.S. at 120. *See also Choteau*, 283 U.S. at 696 ("The intent to exclude must be definitely expressed, where, as here, the general language of the Act laying the tax is broad enough to include the subject matter."). Indeed, the exception seems to adopt, at least in limited circumstances, the very rule that *Tuscarora* rejected. In particular, *Tuscarora* confronted an earlier Supreme Court decision that had held that "'[u]nder the Constitution of the United States, as originally established, . . . [g]eneral Acts of Congress did not apply to Indians, unless so expressed as to clearly manifest an intention to include them,'" *see Tuscarora*, 362 U.S. at 115–16 (quoting *Elk v. Wilkins*, 112 U.S. 94, 99–100 (1884))—precisely the rule adopted by the self-governance exception for laws that "touch[] 'exclusive rights of self-governance in purely intramural matters.'" *Tuscarora*, however, explicitly rejected this rule, explaining that "[h]owever that may have been, it is now well settled by many decisions of this Court that a general statute in terms applying to all persons includes Indians and their property interests." 362 U.S. at 116. *Tuscarora* acknowledged no exception to this general principle for laws that "touch[]

---

actually asserted the self-governance exception as the basis for exempting tribal entities from otherwise generally applicable federal statutes. In one, the court, contrary to the decisions above, applied the exception to a tribal commercial entity in an employment dispute. *See, e.g.*, *Fond du Lac*, 986 F.2d at 249 (Age Discrimination in Employment Act ("ADEA") inapplicable to a dispute involving a tribe member and tribally owned and operated construction company). Another applied the exception to an employment dispute between the tribal housing authority and a tribal employee, *see EEOC v. Karuk Tribe Housing Auth.*, 260 F.3d 1071, 1073 (9th Cir. 2001) (finding ADEA inapplicable), and a third held certain federal civil rights laws inapplicable to a claim that tribal membership had been denied to certain individuals on account of their race, *see Nero*, 892 F.2d at 1463 (noting that "no right is more integral to a tribe's self-governance than its ability to establish its membership"). *Cf. Taylor v. Ala. Intertribal Council*, 261 F.3d 1032 (11th Cir. 2001) (apparently applying self-governance exception to find employment discrimination suit barred by tribal sovereign immunity). Although four other cases are sometimes cited in support of the self-governance exception, on close analysis, we find these cases inapposite. *Reich v. Great Lakes Indian Fish & Wildlife Commission*, 4 F.3d 490 (7th Cir. 1993), and *NLRB v. Pueblo of San Juan*, 276 F.3d 1186 (10th Cir. 2002), are, in our view, best understood as involving the ambiguity-resolving canon, not the self-governance exception to Tuscarora. *See Great Lakes*, 4 F.3d at 494 (finding an "extrinsic ambiguity" in the statute because "[a] literal reading of [it] would create a senseless distinction between Indian police [who were literally covered by the statute] and all other public police [who were explicitly exempted from it]"); *Pueblo of San Juan*, 276 F.3d at 1191–98 (repeatedly citing the ambiguity-resolving canon to hold that a tribal right-to-work ordinance was not preempted by the National Labor Relations Act). And *Donovan v. Navajo Forest Products Industries*, 692 F.2d 709 (10th Cir. 1982), and *EEOC v. Cherokee Nation*, 871 F.2d 937, 938–39 (10th Cir. 1989), involved conflicts between a generally applicable statute and a treaty right, which, we have explained, stands on different footing than the exception for intramural activities. *See supra* note 6. *See also Navajo Forest*, 692 F.2d at 711 ("*Tuscarora* did not . . . involve an Indian treaty. Therein lies the distinguishing feature between the case at bar and the *Tuscarora* line of cases, which stand for the rule that under statutes of general application Indians are treated as any other person, unless Congress expressly excepts them therefrom."); *Cherokee Nation*, 871 F.2d at 938 n.3 (asserting that "the so-called *Tuscarora* rule is not applicable to treaty cases such as this one").

'exclusive rights of self-governance in purely intramural matters.'" This is significant because the law at issue in that case, the Federal Power Act, authorized the recipient of a federal license to condemn land owned by an Indian tribe—a law that would seem to affect tribal self-government. *Id.* at 123–24. Indeed, it was the impact of the Federal Power Act on "the tribal way of life" that caused Justice Black to dissent in that case. *Id.* at 131–42 (Black, J., dissenting) (objecting to majority's application of Federal Power Act to tribal homeland in the absence of clear congressional authorization as contrary to Congress's longstanding policy of protecting Indian reservations).

Nor does the Supreme Court case law cited by the courts of appeals seem to support a self-governance exception to the *Tuscarora* rule. These courts have generally cited the following Supreme Court cases in support of the exception: *Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978); *Roff v. Burney*, 168 U.S. 218 (1897); *Jones v. Meehan*, 175 U.S. 1 (1899); *United States v. Quiver*, 241 U.S. 602 (1916); *United States v. Dion*, 476 U.S. 734 (1986); and *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982). *See, e.g.*, *Farris*, 624 F.2d at 893; *Fond du Lac*, 986 F.2d at 248–49; *Navajo Forest*, 692 F.2d at 713. But it is difficult to see how any of these cases supports the self-governance exception. Unlike numerous decisions of the courts of appeals, none of these Supreme Court cases explicitly acknowledges an exception to the *Tuscarora* rule. Nor do they seem to support such an exception by implication. Two, for example, did not involve generally applicable statutes, but rather, statutes that specifically applied to Indians and Indian tribes; the only issue, then, was the scope of their coverage. *See Santa Clara Pueblo*, 436 U.S. at 55–56 (interpreting the scope of the Indian Civil Rights Act); *Quiver*, 241 U.S. at 605 (interpreting a statute providing that "'so much of the laws of the United States as provides for the punishment of crimes committed within any place within the sole and exclusive jurisdiction of the United States shall be in force in the Indian country'"). Others, while recognizing certain areas of regulation as central to Indian self-government, involved no conflict with federal law, generally applicable or otherwise. *See Roff*, 168 U.S. at 222 (tribal citizenship); *Jones*, 175 U.S. at 29 (inheritance rights); *Jicarilla Apache Tribe*, 455 U.S. at 141 (tribal authority to tax non-Indians who conduct business on reservation). And one, in addition to involving a purported conflict with a treaty (as opposed to an undefined notion of self-government), *see supra* note 7, actually found that the treaty right was *abrogated* by the generally applicable federal law. *See Dion*, 476 U.S. at 738 (Eagle Protection Act abrogated Indian treaty hunting rights).

In short, we simply cannot say with any confidence that the self-governance exception to the *Tuscarora* rule reflects a proper reading of Supreme Court precedent. In the end, however, we need not resolve this question. For the reasons explained below, we conclude that this self-governance exception, even assuming its validity, does not bar application of section 504 of the Rehabilitation Act to tribally controlled schools.

**B.**

Even assuming *arguendo* that there is an exception to the *Tuscorora* rule for general acts of Congress that touch upon the tribes' "exclusive rights of self-governance in purely intramural matters," we conclude that this self-governance exception is inapplicable to this case.

First of all, it is unclear whether this exception would encompass tribal schools at all. It is, of course, true that, as a general matter, education is central to self-government. But this exception to *Tuscarora* (assuming it exists) arguably is more limited. That is, it arguably encompasses not *any* activity that is central to self-government, but rather, only those activities that have, as a historical matter, been left to the control of the Indian tribes, free from federal interference, as part of their residual sovereignty—in other words, only those activities that have *in fact* been left within the control of the Indian tribes. Hence, in describing the rights of Indian tribes that are central to their internal self-government, the Supreme Court has consistently limited its enumeration to rules governing tribal membership, inheritance, and domestic relations. *See, e.g.*, *Wheeler*, 435 U.S. at 322 & n.18 ("unless limited by treaty or statute, a tribe has the power to determine tribe membership, to regulate domestic relations among tribe members, and to prescribe rules for the inheritance of property") (citations omitted); *Santa Clara Pueblo*, 436 U.S. at 55–56 (citing "membership," "inheritance rules," and "domestic relations" as examples of tribes' "power to make their own substantive law in internal matters"). *See also Farris*, 624 F.2d at 893 (identifying "tribal membership," "inheritance rules," and "domestic relations" as possible examples of "exclusive rights of self-governance in purely intramural matters"); *supra* note 8 (citing cases).[10] Tribal schools, in contrast, have, as a historical matter, been subject to extensive federal control. *See, e.g.*, *Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue of N.M.*, 458 U.S. 832, 839–40 (1982) ("The Federal Government's concern with the education of Indian children can be traced back to the first

---

[10] We acknowledge, as discussed above, that some courts have taken a broader view of the exception. *See Fond du Lac*, 986 F.2d at 249 & n.3 (subjecting employment relationship between tribal member and tribal business to federal control and supervision "dilutes the sovereignty of the tribe"; recognizing disagreement with other courts); *Karuk Tribe*, 260 F.3d at 1080–81 (exception applies to purely internal employment dispute between tribal member and tribal government, where tribal government is providing a governmental service). These decisions, however, are in tension with those of other courts that have interpreted the exception more narrowly. *See, e.g.*, *Mashantucket Sand & Gravel*, 95 F.3d at 179 ("tribal power, even regarding exclusively internal conflicts, may be limited by treaty or federal statute, including statutes that are silent as to Indians," noting that "the *Coeur d'Alene* intramural exception does not include *all* aspects of sovereignty") (citations omitted); *Smart*, 868 F.2d at 935 & n.5 (rejecting view that exception applies whenever a statute "affects self-governance as broadly conceived," noting that "[a]ny federal statute applied to . . . a Tribe has the arguable effect of eviscerating self-governance since it amounts to a subordination of the Indian government"); *see also supra* note 8 (citing other cases). Moreover, neither *Fond du Lac* nor *Karuk Tribe* addresses the impact of any congressional statutes that state Congress's understanding of the scope of the statute in question or the extensive federal regulation of the subject matter to which the statute arguably applies.

treaties between the United States and the Navajo Tribe. Since that time, Congress has enacted numerous statutes empowering the BIA to provide for Indian education both on and off the reservation") (footnote omitted) (citing statutes); 25 U.S.C.A. § 2000 (declaring "that the Federal Government has the sole responsibility for the operation and financial support of the Bureau of Indian Affairs funded school system that it has established on or near Indian reservations and Indian trust lands throughout the Nation for Indian children").[11]

---

[11] The BIA school system includes 184 elementary and secondary schools on 63 reservations in 23 states, of which 64 are operated directly by the BIA and 120 are operated by tribes under contract or grant with the BIA; the BIA also operates two postsecondary institutions and provides funding to 25 tribal colleges and universities. *See* U.S. Dep't of the Interior, Bureau of Indian Affairs, Office of Indian Education Programs, Fingertip Facts 2004 at 7, *available at* http://www.oiep.bia.edu/ (last visited Oct. 6, 2004)); *see also* Susan Faircloth & John W. Tippeconnic III, *Issues in the Education of American Indian and Alaska Native Students with Disabilities* (Dec. 2000) (ERIC Clearinghouse EDO-RC-00-3) (of the approximately 500,000 Indian and Alaska Native children who attend elementary and secondary schools, about 90% attend regular public schools, about 10% attend BIA-funded schools, and a small number attend private schools). *See also* Felix S. Cohen, *Handbook of Federal Indian Law* 680–83 (1982) (setting forth a detailed history of the BIA school system). These schools are subject to extensive federal regulation. *See, e.g.*, 25 U.S.C. § 2502(e) (Supp. I 2001) (grants provided to tribally controlled schools "shall not terminate, modify, suspend, or reduce the responsibility of the Federal Government to provide a program"); 25 U.S.C. § 450a(c) (2000) ("The Congress declares that a major national goal of the United States is to provide the quantity and quality of educational services and opportunities which will permit Indian children to compete and excel in the life areas of their choice, and to achieve the measure of self-determination essential to their social and economic well-being."); 25 U.S.C.A. § 2016 (West Supp. 2003) (authorizing the Secretary of the Interior to "prescribe such rules and regulations as are necessary to ensure the constitutional and civil rights of Indian students attending Bureau-funded schools, including such students' rights to—(1) privacy under the laws of the United States; (2) freedom of religion and expression; and (3) due process in connection with disciplinary actions, suspensions, and expulsions"); 25 C.F.R. § 32.4(b), (w) (2004) (directing the Assistant Secretary for Indian Affairs to "[e]nsure the constitutional, statutory, civil and human rights of all Indian and Alaska Native students" and "[e]stablish and enforce policies and practices to guarantee equal opportunity and open access to all Indian and Alaska Native students in all matters relating to their education programs consistent with the provisions of the Privacy and Freedom of Information Acts"). In addition, tribally controlled schools must, as a condition of receiving federal grants and contracts, expressly agree to comply with section 504 of the Rehabilitation Act. *See, e.g.*, 28 C.F.R. § 33.41(f)(10) (2003) (requiring assurance in application for Department of Justice grant programs that applicant and all subgrantees "will comply . . . with the non-discrimination requirements of . . . section 504 of the Rehabilitation Act of 1973"); *id.* § 33.52 (2003) (funding recipients are subject to section 504); *id.* § 42.504(a) (2003) ("Every application for Federal financial assistance [from the Department of Justice] shall contain an assurance that the program will be conducted in compliance with the requirements of section 504 . . . ."); *Grants and Cooperative Agreements with State and Local Governments*, OMB Circular No. A-102 (1997) (requiring executive agencies to use standard assurances forms when awarding grants or cooperative agreements to tribal governments as well as state and local governments); *cf. Sanderlin v. Seminole Tribe of Fla.*, 243 F.3d 1282, 1286–89 (11th Cir. 2001) (fact that tribal government signed assurance did not waive tribal sovereign immunity against private suit); *Hagen v. Sisseton-Wahpeton Cmty. Coll.*, 205 F.3d 1040, 1044 n.2 (8th Cir. 2000) (same). *See also Dep't of Transp. v. Paralyzed Veterans*, 477 U.S. 597, 605 (1986) (acceptance of funds under section 504 and similar statutes is "in the nature of a contract . . . the recipient's acceptance of the funds triggers coverage under the nondiscrimination provision"); *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (same).

In the end, however, we need not decide whether the self-governance exception would extend to tribal schools at all, for whatever the outer limits of the exception, we do not believe it applies where, as here, Congress has specifically stated in statutes its belief that a particular statute applies to Indians. At most, the self-governance exception is a tool to infer whether Congress intended a statute to apply to Indians where the statute does not explicitly so provide. And, as we have explained, it is a tool that is in some tension with the ordinarily dispositive rule that where a statute's meaning is plain, that plain meaning must govern—a rule reflected in *Tuscarora.* In this light, it is difficult to understand how a statute could be interpreted contrary to its plain meaning, pursuant to a canon intended to infer congressional intent in the face of silence, where Congress has, in other statutes, unequivocally stated its understanding of the statute in question. And that is precisely the situation that we confront. For Congress has specifically and explicitly stated its view that section 504 of the Rehabilitation Act applies to tribally controlled schools. As we have explained, the Education Amendments of 1978 directed the Secretary of the Interior to "immediately begin to bring all schools, dormitories, and other facilities operated by the Bureau or under contract with the Bureau in connection with the education of Indian children into compliance with . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794)," Pub. L. No. 95-561, § 1125, 92 Stat. at 2319, and the No Child Left Behind Act of 2001 requires that "[t]he Secretary shall immediately begin to bring all schools, dormitories, and other Indian education-related facilities operated by the Bureau or under contract or grant with the Bureau, into compliance with . . . section 794 of Title 29 [section 504]." 25 U.S.C. § 2005(b)(1). Accordingly, the self-governance exception is simply inapplicable to this case.

We therefore conclude that section 504 of the Rehabilitation Act generally applies to tribally controlled schools that receive federal financial assistance from the Department of Justice.

NOEL J. FRANCISCO
*Deputy Assistant Attorney General*
*Office of Legal Counsel*